AHILAN T. ARULANANTHAM (SBN 237841)
aarulanantham@aclusocal.org
PETER J. ELIASBERG (SBN 189110)
peliasberg@aclusocal.org
PETER BIBRING (SBN 223981)
pbibring@aclusocal.org
EVA BITRAN (SBN 302081)
ebitran@aclusocal.org
DAE KEUN KWON (SBN 313155)
akwon@aclusocal.org
ADRIENNA WONG (SBN 282026)
awong@aclusocal.org
ANA NAJERA MENDOZA (SBN 301598)
amendoza@aclusocal.org
LIGA CHIA (SBN 328143) *application for admission forthcoming*
lchia@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5211

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| Black Lives Matter - Los Angeles; Kimberly Beltran Villalobos; Eric Jeffrey Stith; Tom Dolan; Lexis Olivier Ray,<br><br>Plaintiffs,<br><br>v.<br><br>Eric Garcetti, Mayor of Los Angeles; Michel R. Moore, Chief of the Los Angeles Police Department; City of Los Angeles; Alex Villanueva, Sheriff of Los Angeles County; Kathryn Barger, Chair of the Los Angeles County Board of Supervisors; Teri Ledoux, City Manager and Director of Emergency Services for the City of San Bernardino; Eric McBride, Chief of the San Bernardino Police Department; City of San Bernardino,<br><br>Defendants. | Case No.  2:20-CV-04940<br><br>**COMPLAINT** |

**INTRODUCTION**

1.      Plaintiffs are an organization and several individuals who are among the more than 10 million people whose liberty Defendants have curtailed by imposing a set of unprecedented curfew orders on virtually everyone living in a large swath of Southern California. Those orders have entirely eliminated all political protest in the night hours, during a time when thousands of law-abiding people seek to express their opposition to racially-discriminatory police violence. The orders have also prohibited a massive swath of entirely innocuous activity, including grocery shopping, recreational physical activity of any kind, and visits to loved ones, with only extremely narrow exceptions. And the orders have made it extremely difficult for certain journalists to report on what occurs at night.

2.      Whether or not Defendants were justified in imposing curfews in the immediate aftermath of the largely peaceful protests that occurred over the last several days, at this juncture the curfews are unconstitutional. Their truly extraordinary suppression of literally all political protest after dark plainly violates the First Amendment. Their blanket restriction on all movement during those hours violates the Constitution's protection for freedom of movement. And, as written and implemented, the curfews fail to provide constitutionally-sufficient notice.

**JURISDICTION**

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. 1331, 28 U.S.C. 1343, and 42 U.S.C. 1983, because this lawsuit alleges violations of federal law: deprivations of rights under the United States Constitution.

4.      Defendants have no sovereign immunity in this action, as Plaintiffs have sued them in their individual capacity for injunctive relief from constitutional violations. *Ex Parte Young*, 209 U.S. 123 (1908)

**VENUE**

5.      Venue is proper under 28 U.S.C. 1391(b) because a substantial part of

1

the events or omissions giving rise to the claims herein occurred in this District, and because Defendants are subject to the court's personal jurisdiction in this District.

**PARTIES**

**Plaintiffs**

6.     Black Lives Matter – Los Angeles (BLM-LA, or BLM) is a group of individuals dedicated to freedom and justice for all Black people. Dozens of their members, as well as hundreds of people who have sought to attend protests organized by BLM, have had their protected political speech suppressed by Defendants' curfew orders.

7.     Kimberly Beltran Villalobos is a first-year college student who resides in an unincorporated area of East Los Angeles with her parents and siblings. During the day, she attends classes, does schoolwork, and also works via a fellowship program with a local nonprofit. She has therefore been unable to participate in protests or do other daily tasks except in the evenings. She has been cited for violating the curfew twice, once while attending a protest and once while moving her car near house after picking her mother up from work.

8.     Eric Jeffrey Stith is a resident of Los Angeles County in an unincorporated area near the City of Palmdale. But for Defendants' curfews, he would engage in ordinary activity around his neighborhood, including walking, going to the grocery store. He would also like to attend protests against police violence, but has been unable to do so without taking leave from work because of Defendants' curfews.

9.     Lexis Olivier Ray is a housing and justice reporter at LA Taco, a local media outlet that covers local news and politics, who has been covering protests against police brutality spurred by the murder of George Floyd in both the City and County of Los Angeles.  He has a press pass from LA Taco but does not have a press credential issued by the Los Angeles County Sheriff's Department or Los

2

Angeles Police Department.  While he has been covering protests, he has observed many others, including journalists, arrested for curfew violations, and has been detained himself.  He believes the protests against police brutality are incredibly important and plans to cover them, but fears that he will be arrested if he covers protests that last later than curfew.

10.     Thomas Dolan is a resident of the City of San Bernardino and the Executive Director of Inland Congregations United, a faith-based non-profit community organization serving San Bernardino and Riverside Counties.  He has been attending and supporting the protests and vigils that have taken place in the City of San Bernardino in the wake of George Floyd and Breonna Taylor's murders, but the curfew issued June 2 by the city of San Bernardino has disrupted his participation in and organization of protests and vigils against police brutality.

**Defendants**

11.     Defendant Eric Garcetti is Mayor of Los Angeles. He signed and issued the curfew orders for the City of Los Angeles.  He is sued in his official capacity.

12.     Defendant Michel R. Moore is Chief of the Los Angeles Police Department, which he directs in the enforcement of curfew orders through arrest and citation by the Los Angeles Police Department. He is sued in his official capacity.

13.     Defendant Kathryn Barger is an elected Supervisor of the County of Los Angeles and Chair of the Los Angeles County Board of Supervisors. She signed and issued the curfew orders for the County of Los Angeles. She is sued in her official capacity.

14.     Defendant Alex Villanueva is Sheriff of Los Angeles County, in which role he directs the enforcement of the curfew orders through arrest and citation by the Los Angeles Sheriff's Department. He is sued in his official capacity.

15.     Defendant Teri Ledoux is City Manager and Director of Emergency Services for the City of San Bernardino. She signed and issued the curfew order for the City of San Bernardino.  She is sued in her official capacity.

16.     Defendant Eric McBride is Chief of the San Bernardino Police Department, which he directs in the enforcement of the curfew order issued in the City of San Bernardino. He is sued in his official capacity.

17.     Defendants City of Los Angeles and City of San Bernardino are public entities organized and existing under the laws of the State of California.

## STATEMENT OF FACTS

18.     Law enforcement officers and other state actors in the United States have long targeted Black residents for racially-discriminatory policing and violence. For just as long, Black people have resisted such violence with peaceful protest.

19.     The most recent chapter of this history began with the murder of George Floyd by police officer Derek Chauvin in Minnesota.

20.      On May 25, 2020, Mr. Chauvin murdered Mr. Floyd, a 46-year-old Black man. Chauvin pressed his knee into Mr. Floyd's neck, obstructing his breathing for almost 9 minutes. Mr. Floyd's cruel and senseless murder, on top of the hundreds of other Black people whom police have killed in recent years, sparked widespread outrage at the injustice Black people suffer at the hands of police in this country.

21.     As more people became aware of Mr. Floyd's senseless death, demonstrations spread from Minneapolis to other cities around the country, including Los Angeles, Santa Monica, San Bernardino, and other cities within Los Angeles and San Bernardino counties.

22.     On May 27, 2020, largely peaceful demonstrations organized by Black Lives Matter took place in downtown Los Angeles. Organizers had asked demonstrators to practice social distancing and wear masks as they led the march

through the day. During the next two days, demonstrators continued to march. They gathered in various locations, including outside the headquarters of the Los Angeles Police Department, to voice their outrage at police violence.

23.     Protests grew in the following days. Upon information and belief, between May 29 and June 3, 2020, approximately 30,000 people participated in protest demonstrations, almost of all of which were entirely peaceful, throughout Los Angeles County. Large protests also occurred in other regions of Southern California.

24.     Concurrently and after the protests, some neighborhoods within the City and County of Los Angeles were subject to property damage by third parties who were not part of Black Lives Matter or most other organized protest groups. Upon information and belief, these incidents occurred only in neighborhoods in the Downtown and Fairfax, Hollywood, Long Beach, Santa Monica, and Van Nuys areas of Los Angeles County. Upon information and belief, protesters have not caused physical harm to anyone attending a protest, and not a single person has died in the course of any conflict arising from a protest.

25.     Following the first large demonstrations, Los Angeles Mayor Eric Garcetti issued the first in a series of curfews on May 30, 2020 at 6:30pm, prohibiting any person from leaving their homes and navigating the public streets and all public areas within the city limits of Los Angeles from 8pm to 5:30am. The order contained a few narrow exceptions, such as for travel to work, travel by certain officials (including law enforcement), and for medical care. However, it did not exempt a broad swath of entirely innocuous activity, including grocery shopping, caring for relatives, and recreational jogging, bike-riding, or dog-walking. It also included no exception for members of the press. The Mayor issued a second curfew order on May 31, 2020 at 12:00pm, prohibiting any person from leaving their homes and navigating the public streets from 8:00pm to 5:30am. It included an exception for credentialed media but no other additional material

exemptions. On June 1, 2020, the city announced another curfew order at around 12pm, restricting people from leaving their homes from 6pm to 6am. On June 2, 2020, a citywide curfew order was issued at around 1pm, prohibiting persons from leaving their homes from 6pm to 6am. And on June 3, 2020, a fifth curfew order was issued at around 1pm, prohibiting people from leaving their homes from 9pm to 5am.

26.    Los Angeles County issued a separate curfew order, signed by County Supervisor Barger on May 31, 2020. The order prohibited any person from leaving their home and navigating the public streets within the entire unincorporated and incorporated areas of Los Angeles County from 6pm to 6am. It too contained only the narrowest of exemptions, including no press exemption. On June 1 and June 2, 2020 similar curfew orders were issued prohibiting any persons from leaving their homes from 6pm to 6am. These added an exemption for credentialed press, but again no others. And on June 3, 2020, at around 1pm a countywide curfew was issued to go into effect from 9pm to 5am.

27.    Although Los Angeles County Sheriff Villanueva did not issue the curfew order, he has made statements purporting to define or alter its scope. On June 2, 2020, he stated the curfew order would remain in effect "until organized protests are gone." Then, on June 3, 2020, he tweeted that he would not enforce the curfew until 10pm, despite it ostensibly continuing to restrict activity after 9pm.

28.    The City of San Bernardino issued its first curfew order on May 31, 2020, from 8pm to "sunrise." The next day, on June 1, 2020, the City issued a second curfew order prohibiting any person from leaving their homes from 6pm to sunrise, with no end date. The order also includes only very narrow exceptions, including for travel to or from work.

29.    The San Bernardino order also includes an exemption from travel to and from religious meetings, but not for secular meetings.

30.    Law enforcement officials throughout Los Angeles and San

Bernardino counties have enforced the curfews vigorously, arresting hundreds of peaceful demonstrators as well as many residents who were not demonstrating. According to the Los Angeles Chief of Police, LAPD officers alone arrested more than 2,700 individuals over a span of four days (May 29 to June 2). 2,500 of these arrests (92%) were for curfew violations. Thus, the overwhelming majority of the arrests that law enforcement officials made were completely unrelated to any act of property damage.

31.     Law enforcement officials have also utilized remarkably aggressive tactics against numerous protesters and residents since the curfew orders went into effect. As Plaintiffs' experiences show, law enforcement officials have detained and arrested individuals simply for gathering to peacefully protest, and for engaging in mundane activities like simply walking on the street near one's home.

**Plaintiffs**

### A.     Black Lives Matter-Los Angeles

32.     Black Lives Matter-Los Angeles (BLM-LA) began working to liberate Black people from state-sponsored violence long before the death of George Floyd. It was the first chapter to form in what is now the Black Lives Matter's Global Network, which includes dozens of chapters around the world. The organization grew out of the death of Trayvon Martin, who was murdered by George Zimmerman. After Zimmerman was acquitted in July 2013, BLM-LA took to the streets to demand change.

33.     BLM-LA has hundreds of active members in the Southern California region.  To become eligible for membership, people must attend three trainings where they learn the history and methodology of BLM's struggle, among other topics.

34.     Political protest is a fundamental component of BLM's struggle for freedom and justice. BLM-LA has engaged in numerous political protests since 2013, including during #OccupyLAPD (an 18-day encampment in the name of

Ezell Ford), the #DecolonizeLACityHall (a 54-day encampment in the name of Redel Jones), the successful #FireBeck campaign (against the former LAPD chief), and several actions that led to the passage of SB 1421, a police transparency bill, among many others actions.

35.    BLM-LA has also supported families whose loved ones have been murdered by law enforcement officials. Those actions have typically included political protests organized alongside the families calling for justice. Families they have supported include those of the following community members, among many others: AJ Weber, Ryan Twyman, Grechario Mack, Cristopher Deandre Mitchell, and Albert Ramon Dorsey.

36.    Law enforcement agencies—primarily LAPD and LASD—have killed more than 600 Angelenos since 2012.

37.    BLM-LA has also participated in meetings of the LAPD Police Commission ("APC) and Sheriff's Civilian Oversight Commission (COC) meetings to monitor the civilian governmental bodies that are supposed to monitor LAPD and LASD, respectively.

38.    BLM-LA has been part of a core set of organizations in California that have pushed for state legislation to bring about greater transparency and accountability of law enforcement agencies.  State laws recently enacted based on BLM-LA's advocacy include SB 1421, under which previously secret documents relating to officers' serious use of force, sexual assault, and dishonesty are now open to the public, and AB 392, which revised California's laws on the use of deadly force by police. BLM-LA has also advocated for these laws to be fully implemented at LAPD and LASD.

39.    Most recently prior to George Floyd's death, BLM-LA had organized a local coalition, under the campaign name the "People's Budget LA," to challenge Mayor Eric Garcetti's proposed budget, which seeks to add $123 million to LAPD's budget and give 54 percent of the City's general funds to LAPD.  The

8

campaign's purpose is to significantly defund LAPD.

40.     After Derek Chauvin murdered George Floyd, BLM-LA increased its political protest activity, starting with an action on Wednesday, May 27, 2020 at the Hall of Justice in downtown Los Angeles, CA. It then organized another protest and march on Saturday, May 30, at Pan Pacific Park in Los Angeles, CA.  That action began at 12pm and concluded nonviolently at 2pm after a brief march down Third Avenue.

41.     BLM-LA organized another protest on Tuesday, June 2, in Hancock Park, Los Angeles, CA, at the Mayor's Residence, beginning at 3pm and concluding at 6pm.

42.     BLM-LA's protests have been overwhelmingly peaceful; without any injury to persons or destruction of property. Its members have remained nonviolent during the protests, despite police action that often creates tense situations.

43.     Some limited property damage caused by others has occurred after the BLM-LA protests have concluded.

44.     Nonetheless, the curfews imposed by the City and County of Los Angeles have drastically undermined the power and efficacy of BLM-LA's political protests in several ways. Organizers have had to change the times of protests to accommodate the curfews, which has decreased the number of people who would have attended.

45.     Even when BLM-LA members have protested during hours not permitted by the curfew, many individuals who would otherwise have joined their protests have not done so out of fear of being arrested.

46.     In addition, the curfews have given police an excuse to commit violence against BLM-LA's members and others who have joined in the protests. In the last few days, police have shot protesters with rubber bullets, beaten them with batons, and arrested or detained many of BLM-LA's members simply because they engaged in peaceful protest activity during restricted hours.

47.    BLM-LA's leadership, including Professor Melina Abdullah, have been forced by the curfew to spend hours strategizing about how to respond to the curfews.  Had there been no curfews, BLM-LA would have focused its full attention instead on addressing the underlying issues of concern in the protests themselves, including most importantly police violence against Black people.

48.    BLM-LA intends to protest during restricted hours in order to continue to advance our goal of freedom and liberation. They sincerely believe they must do so in order to bring about justice for community members whom law enforcement agencies have killed and brutalized, as well as to transform the police state and criminal legal system.

49.    BLM-LA's leadership and members, including Professor Abdullah, remain deeply concerned that they will be arrested or even bodily harmed and brutalized pursuant to the curfew orders, in response to their exercise of their First Amendment rights.

**B.    Kimberly Beltran Villalobos**

50.    Kimberly Beltran Villalobos (Ms. Beltran) was born and raised in Los Angeles County. She presently resides in an unincorporated area of East Los Angeles, California. She lives with her parents and siblings.

51.    Ms. Beltran Villalobos is a first-year college student.  She also participates in a fellowship program with a local non-profit organization.

52.    Ms. Beltran Villalobos supports her family in various ways, including by handling the grocery shopping and transporting her mother to and from her workplace, which is also located in an unincorporated part of East Los Angeles. Ms. Beltran Villalobos typically takes her mother to work and picks her up at the end of her shift, typically around 11pm.

53.    Ms. Beltran Villalobos has been cited twice for violating the curfew orders.

54.    On June 1, 2020, she took her mother to work around approximately

2pm. At that time, she was unaware that a curfew would be in effect later that day.

55.   Around 10:50pm, Ms. Beltran Villalobos went to pick up her mother from work and returned home around 11:20pm. Because she had to turn in a homework assignment by midnight, she temporarily parked her car close to her home in a convenient spot. After turning in the assignment, she went back out to move her car and parked it directly across the street from her home, at shortly after midnight on June 2, 2020.

56.   After she parked the car and exited the vehicle, two Los Angeles Sheriff's Department officers stopped her. The officers threatened to take her to jail, and ultimately cited her for violating the curfew, despite her explaining to them that she was already home and simply moving between parking spots.

57.   Ms. Beltran Villalobos was also cited a few days before that, on May 30, 2020. That day she went to participate in a protest over the murder of George Floyd in downtown Los Angeles.

58.   Around 8pm, while she was protesting peacefully in downtown, law enforcement officers surrounded her and other protesters. They directed her to lay on the floor with her hands over her head. She immediately complied. An officer who was not wearing a face mask then put plastic handcuffs on her very tightly.

59.   Ms. Beltran Villalobos was already wearing a face mask when police officers handcuffed her, but the mask began to slip down while the officers moved her to a van. She tried to move her face mask up using her tongue, but she was largely unsuccessful.

60.   The police then placed her in a crowded van with other protestors and police. She had no choice but to sit in close proximity to other people while in the van, with no space to socially distance and no way to properly re-position her mask.

61.   The officers took her to the Los Angeles Police Department station in

11

downtown Los Angeles, issued a citation to her for violating curfew, and released her.

62.     While Ms. Beltran Villalobos understandably wants to continue to support her family in shopping for groceries and handling other needs, including transporting her mother to work, she is fearful of doing so. Each time she considers doing some essential activity she asks herself "is this drive worth getting arrested for?"

63.     Ms. Beltran Villalobos also wants to participate in peaceful protests in the future, but she is disinclined to do so so long as the curfew is in place, as she fears being arrested again.

**C.     Eric Stith**

64.     Eric Stith is a software engineer who resides in an unincorporated area southeast of Palmdale, CA, towards the northern end of Los Angeles County. He has lived there for seven years, and in the Antelope Valley for eight years.

65.     No major civil disturbance of any kind, however defined, has occurred anywhere near Mr. Stith. Nonetheless, for the last several days he has been subjected to the Los Angeles County curfew order.

66.     Mr. Stith's work as a software engineer requires his undivided attention during normal business hours. He can engage in personal activity during the day, but only if he requests time off work.

67.     Prior to the imposition of Los Angeles County's curfew, Mr. Stith would regularly go for walks in and around his neighborhood in the evenings and nights, including after 9pm. The mountains and landscape of the Antelope Valley are perhaps the most beautiful in all of greater Southern California.

68.     Prior to the curfew Mr. Stith also regularly went to the grocery store in the evenings and nights, including after 9pm. He also would occasionally ride his bike around the neighborhood outside of work hours.

69.     Mr. Stith can no longer engages in these (or any other) outdoor night-

time activities, as they are prohibited by the County's curfew order.

70.     Since George Floyd's murder, peaceful protests against police violence have occurred in the Palmdale area. Mr. Stith would like to attend them, but cannot do so because the protests are scheduled for daytime hours because of the curfew.

### D.     Lexis O. Ray

71.     Lexis Olivier Ray (Mr. Ray) is a housing and justice reporter at L.A. Taco, a local media outlet that covers local news and politics, where he has worked for about two years.  He does not have an official LAPD or LASD press pass or media credential, although he does have a press pass issued by L.A. Taco. He has typically been able to do the reporting work he needs to do without an LAPD and LASD press pass.  However, since the imposition of curfew orders by the City and County of Los Angeles, which exempt credentialed journalists but not journalists like him who do not have a credential, he is extremely concerned that he will be arrested for trying to cover protests that continue after curfew has begun.

72.     Mr. Ray has been covering protests against police brutality spurred by the murder of George Floyd in both the City and County of Los Angeles starting on Saturday, May 30, when he attended a BLM-LA protest and march in the Fairfax area of The Grove.  He was also present at a protest at City Hall on Sunday, May 31, which ended with many people getting arrested for violating curfew.  He covered a BLM-LA protest at Mayor Eric Garcetti's house on Tuesday, June 2, and then subsequently continued to the intersection of Eight Street and Crenshaw Boulevard.  There, he observed a number of people, including those who were at the protest at the Mayor's mansion and a multimedia journalist who has done work for L.A. Taco, arrested by LAPD for curfew violations.

73.     On Tuesday, Mr. Ray became aware that BLM-LA was organizing a protest to begin at a park near Mayor Garcetti's residence. The protest was scheduled to start at about 3pm, and he showed up to the area at about 2:30pm to

scout it out.  At the park, he observed protestors gather and he then followed them to the Mayor's house, shooting photos and videos for his story.  There were initially about 100 to 150 people in the park, but eventually the protest swelled to what appeared to him to be more than 1,000 people.  Protestors watched BLM-LA's traditional ceremony honoring Black lives killed by police violence to begin the protest, listened to speeches, and then took part in a variety of chants to protest police brutality.  The gathering was entirely peaceful.  At no point did he witness any protestor do anything violent or threaten to do anything violent.  The protest lasted until about 6pm.  He did not observe any arrests.

74.    After the protest ended, he went back to a production vehicle to regroup and decide where to go next.  Sometime later, he was informed by someone in the area that Wilshire Boulevard had been blocked by police.  He drove to that area and continually ran into police lines that LAPD officers told him he could not cross.  Eventually, he ended up on foot at the intersection of Eight Street and Crenshaw Boulevard, where there was another police line and behind it dozens of people in handcuffs.  He also observed dozens, if not hundreds of LAPD officers, including officers from the Metro Division in the area.  The time was about 8pm.

75.    At the intersection of Eighth Street and Crenshaw Boulevard, Mr. Ray was told he could not cross the police line and was told to back up.  He ended up standing on the southwest corner of the intersection, where apparently journalists without an LAPD credential had to be cornered off.  The Metro Division officers aggressively told them to back up; they could not even take a step onto the street.

76.    At some point, on the other side of the police line, someone in handcuffs began calling out for Mr. Ray.  The woman calling to Mr. Ray was wearing a mask, so Mr. Ray could not recognize her at first, but he eventually figured out it was Samanta Helou-Hernandez, a freelance multimedia journalist

14

who regularly does freelance work for L.A. Taco and other media outlets. When he recognized who it was, he told an LAPD supervisor that Samanta was a journalist and asked if he could go to the other side of the police line to speak with her.  The LAPD supervisor called someone from LAPD media relations, who came in about 30 minutes.  The LAPD supervisor escorted Mr. Ray over to her and then back a few times to speak with Samanta, and Mr. Ray was eventually able to persuade the LAPD that she was a journalist by showing them some of her media clips on his phone.  They then took off her cuffs and released her and her partner, who is a photographer working with her.  She was held in LAPD's custody for about 45 minutes.

77.     Samanta told Mr. Ray she had been arrested for violating curfew. She told him that there was no order to disperse prior to the LAPD's coming to arrest her and others for violating curfew.  Mr. Ray also spoke with others on the scene who also told him that they were arrested for violating the City's curfew order.  Overall, Mr. Ray was in the area for about two hours.  While he was there, he observed many dozens of people taken in handcuffs onto a bus to be transported for booking.

78.     On Sunday, May 31, Mr. Ray was working for L.A. Taco, covering a protest in the City Hall area that ended with dozens of people being arrested for curfew violations, and at which he was very concerned that he, too, would be arrested for violating curfew.  There were about a hundred people at this protest, which took place just west of City Hall on Spring Street, between First and Temple Streets, and it was peaceful.  He saw no violence or destruction of property, other than seeing one small plastic water bottle thrown by someone in the crowd.  It was a warm day, and many people at the protest had small plastic water bottles, which they did not throw at the police or anyone else.  Nonetheless, at about 5pm, the LAPD declared unlawful assembly on the ground that it was past curfew and then began to box in protestors with police lines to the north, south, and west, and City

Hall blocking them on the east. He was one of the people boxed in by the LAPD, and he documented people being handcuffed and taken away for violating curfew. He was one of the very last people approached by the LAPD as they were arresting people. Mr. Ray was with other journalists and a supervisor came up and demanded to see their press passes. He was very concerned that he would be arrested for violating curfew because he did not have an official LAPD press credential and the LAPD was checking aggressively. Fortunately, the officer looked at his L.A. Taco press pass and let him go.

79. The most aggressive actions Mr. Ray saw at City Hall that day were taken by LAPD, largely threatening people with less lethal weapons. At one point, however, he also saw an LAPD officer unholster and pull out what appeared to be a handgun, which seemed totally unnecessary given the peaceful nature of the protest.

80. Mr. Ray believes these political protests against police brutality are newsworthy, and he intends to continue covering these protests daily as long as they continue. He understands that specific protests are scheduled and will last past the time set for the City and County curfews to begin. And, even if the protests are not scheduled to last past the curfew, his experience is that they sometimes end with the declaration of an unlawful assembly, containment of the protestors, and significant numbers of arrests that are unlikely to be completed until late into the night. Those arrests are an important part of the story, and he would like to cover them as part of coverage of the protests.

81. Mr. Ray is very concerned that if he continues to gather news about the protests and their aftermath past the curfews, he will be arrested by either LAPD or LASD because he does not have an official LAPD or LASD press credential. This concern is based on the clear language of both curfew orders that do not exempt non-credentialed journalists, his seeing a journalist colleague of his Samanta Halou-Hernandez cuffed and detained for a significant period of time by

16

the LAPD at the intersection of Eight Street and Crenshaw Boulevard while attempting to cover the protestors. He is also concerned because on many occasions LAPD personnel have not treated him as a credentialed journalist with access, such as crossing police lines, that is available to credentialed reporters, and he fears they will treat him the same way with respect to enforcement of the curfews. LAPD officers have even told him that they do not understand or are confused about the rights of media with respect to the curfews, crossing police lines, and related issues.

### E. Thomas Dolan

82. Thomas Dolan (Mr. Dolan) lives and works in the city of San Bernardino. He is the Executive Director of Inland Congregations United for Change (ICUC), a faith-based 501(c)(3) non-profit community organization serving San Bernardino and Riverside Counties, which empowers people of faith to transform and revitalize the Inland Empire by working in the civic arena for the common good.

83. Mr. Dolan's work aims to dismantle the social systems that create injustice and oppression for youth, immigrants, parents, people of color, and people who were formerly incarcerated, among others. Organizing and participating in protests, marches, vigils, and other actions against police violence is central to Mr. Dolan's work. During the 22 years Mr. Dolan has lived in San Bernardino, he has organized or attended over a hundred actions calling for an end to police violence in the city.

84. Mr. Dolan has participated in protests and marches for racial justice and against police brutality in the city of San Bernardino following the murders of George Floyd and Breonna Taylor. Mr. Dolan has also supported San Bernardino youth organizers who lead peaceful protests, vigils, and marches during this time. Specifically, Mr. Dolan attended two actions on June 2, 2020: a protest at the County Board of Supervisors aimed at getting the District Attorney and

Supervisors to declare racism a public health emergency in the city, and a march from ICUC's office to downtown San Bernardino. Mr. Dolan also attended a youth-led protest in San Bernardino during the afternoon of June 3, 2020.  These protests were fully peaceful, without injury or violence.

85.     The city of San Bernardino's curfew has meaningfully disrupted Mr. Dolan's participation in and organization of protests and vigils against police brutality. Mr. Dolan and the youth he works with have had to change how they protest, whom they convene, and how they organize to ensure neither he nor attendees at the actions are arrested for violating the curfew. For example, because of the curfew, an action on June 2, 2020 that Mr. Dolan supported and attended was forced to reschedule from after work hours to earlier in the afternoon. The June 3, 2020 action was also rescheduled from the evening to the afternoon to avoid the curfew. As a result of these changes, and the threat of the curfew, fewer people were able to attend.

86.     If there were no curfew, Mr. Dolan would continue to organize and participate in protests and vigils for the evening hours—but at the moment, he is disinclined to do so, because he does not want to be arrested. If there were no curfew, Mr. Dolan could also safely invite youth and other more vulnerable people to join actions without fearing for their arrest. Nonetheless, Mr. Dolan plans to continue to attend and support peaceful actions against police violence.

87.     Mr. Dolan was unable to find San Bernardino's emergency order on the city's website, so he was not certain what essential activity might be exempted from the curfew. Because the city took no input from residents when issuing the order, he fears it may arbitrarily encompass lawful conduct and be used to intimidate or harass residents.

88.     Mr. Dolan also fears that the early nature of the curfew may subject him to arrest for simply existing in his community. Mr. Dolan wants to continue to provide for his immediate needs and those of his family but worries even these

essential activities, if performed after work hours, may lead to his arrest.

89. The evening he filed this complaint, Mr. Dolan's daughter—who is fourteen years old—was at a public meeting with a member of the San Bernardino School Board, which ran until after curfew. He fears that she may be at risk because of the City's emergency order.

## LEGAL FRAMEWORK

Defendants' curfews are unconstitutional in several respects.

### A. Defendants' Curfews Suppress Plaintiffs' First Amendment Rights

90. Defendants' curfews violate the First Amendment's prohibition on laws restricting speech. The "principal function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Texas v. Johnson*, 491 U.S. 397, 408–09 (1989) (citation and quotation marks omitted). Defendants' curfews dramatically restrict free speech by entirely suppressing all demonstrations occurring after 6pm in the case of the City of San Bernardino and 9pm in the case of the City and County of Los Angeles.

91. The First Amendment generally requires the state to punish those few who break the law rather than preventively suppressing everyone's protected speech because of what a few people may do afterwards. "The generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs … First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence." *Collins v. Jordan*, 110 F.3d 1363, 1371–72 (9th Cir. 1996). Because an unlawful assembly can be declared only for "assemblies which are violent or which pose a clear and present danger of imminent violence," *In re Brown*, 9 Cal. 3d 612, 623 (Cal. 1973), so too curfews are authorized, if at all, only when the state

has no other means to prevent actual or imminent mass violence.

92.    To satisfy First Amendment requirements, a curfew must both be narrowly tailored and allow for ample alternative channels of communication. A "restriction that meets the ample alternative requirement can fail the narrow tailoring requirement." *Matter Utah v. Njord*, 774 F.3d 1258, 1267–68 (10th Cir. 2014) (citing *United States v. Grace*, 461 U.S. 171 (1983)). Defendants' curfews fail the narrow tailoring test not only because of their extraordinary geographic scope, but also because the lock-down they order restricts *far* more speech than necessary to achieve their aim. Defendants may enforce "other laws at [their] disposal that would allow [them] to achieve [their] stated interests," including the criminal laws prohibiting damage to property and, if necessary as a last resort in narrowly defined circumstances, unlawful assembly. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011). Absent actual or imminent mass violence, "[o]bvious, less burdensome means for achieving the [City's] aims are readily and currently available by employing traditional legal methods." *Foti v. City of Menlo Park*, 146 F.3d 629, 642–43 (9th Cir. 1998).

93.    Here, arrest data establishes that the number of acts of property damage is small in comparison to the amount of nonviolent protest, and the number of acts of violence - by protesters - is far smaller still. Because "there are a number of feasible, readily identifiable, and less-restrictive means of addressing" the Defendants' interests, each of Defendants' curfews "is not narrowly tailored" to serve those interests. *Comite de Jornaleros*, 657 F.3d at 950.

**B.    The San Bernardino Defendants' Curfew Separately Violates the First Amendment's Establishment Clause**

94.    The City of San Bernardino's Executive Order violates the First Amendment Establishment Clause's prohibition on the government endorsing religion. Section 6 of the Order imposes a daily curfew from 6:00 p.m. until

sunrise, but exempts, among other things, "persons travelling to or from work or religious meetings." San Bernardino Executive Order No. 2020-04, Section 6. The Order therefore has the primary effect of endorsing religion by permitting only religious meetings, to the exclusion of secular ones. *See Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007) (applying *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971)). Section 6 of the Order further violates the First Amendment's Speech Clause. The Order's exemption for religious assemblies but not others—not political party meetings, not gatherings to plan a protest—is a content-based restriction not necessary to a compelling government interest and not narrowly tailored to achieve only that purpose. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015).

### C.   Defendants' Curfews Violate Plaintiffs' Freedom of Movement

95.     Defendants' curfews violate the Constitution's protection for the freedom of movement. "Citizens have a fundamental right of free movement, 'historically part of the amenities of life as we have known them.'" *Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (citations omitted). "In all the [s]tates from the beginning down to the adoption of the Articles of Confederation the citizens thereof possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective [s]tates, to move at will from place to place therein, and to have free ingress thereto and egress therefrom . . ." *United States v. Wheeler*, 254 U.S. 281, 293 (1920). While the state may impose restrictions on this right, any restrictions must both serve a compelling state interest and be narrowly tailored to accomplish that objective. *Nunez*, 114 F.3d at 946 (applying strict scrutiny to curfew order even though it only applied to minors).

96.     Defendants' restrictions on movement are not narrowly tailored. Apart from the geographic breadth of Defendants' curfews, their curfews apply to all kinds of entirely innocuous movement. To give but a few examples, Defendant City of Los Angeles's curfew bans Ms. Beltran Villalobos from picking up her

mother after work or going to the grocery store, bans Mr. Stith from walking around his house near Palmdale, and bars LA Taco journalists from covering activity occurring during restricted hours. Indeed, the curfew orders have the effect of placing nearly everyone in Defendants' jurisdictions, including *ten million people* in LA County, under house arrest for at least eight hours each night. The Constitution does not permit such a draconian deprivation of liberty under these circumstances. *Cf. Nunez*, 114 F.3d at 948 (striking down curfew order because "it does not provide exceptions for many legitimate activities.").

### D. Defendants' Curfews Contain Insufficient Notice

97.    Defendants curfews are also constitutionally inform because they provide insufficient notice, as they contain no provision requiring authorities to notify individuals prior to enforcing them.

98.    Both the Fifth and Fourteenth Amendments prohibit deprivations of liberty without "due process." The most essential element of due process is, of course, notice. Due process requires that notice "be of such nature as reasonably to convey the required information." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

99.    Due process requires that officers seeking to enforce curfews provide notice to the general population of their intent to do so. *See e.g., In re Juan C.*, 28 Cal. App. 4th 1093, 1097 (Cal. Ct. App.1994) (order permitted arrest only of "such persons as do not obey this curfew after due notice, oral or written, has been given to said persons") (emphasis added).

100.    In addition, the Orders have been ambiguous as to critical terms, including whether they include exemptions for media personnel, their temporal scope, which appeared to change by tweet mere hours before the filing of this complaint, and even whether they will go into effect at all, which people sometimes know only a few hours before they occur, if at all.

# CLAIMS FOR RELIEF

**COUNT ONE: Violation of the First Amendment to the United States Constitution: Free Speech and Assembly**
**(by Plaintiffs BLM-LA, Beltran Villalobos, Stith, and Ray against all Los Angeles Defendants; and by Plaintiff Dolan against the San Bernardino Defendants)**

101.   Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1-89 as though set forth fully herein.

102.   The curfew orders are not narrowly tailored, insofar as they suppress far more speech, assembly, and other protected First Amendment activity than necessary to deal with any emergency currently in existence. "Banning or postponing legitimate expressive activity because other First Amendment activity regarding the same subject has resulted in violence deprives citizens of their right to demonstrate in a timely and effective fashion."*Collins v. Jordan*, 110 F.3d 1363, 1371–72 (9th Cir. 1996). Because "there are a number of feasible, readily identifiable, and less-restrictive means of addressing" Defendant's interests, the curfew "is not narrowly tailored" to serve those interests. *Comite de Jornaleros*, 657 F.3d at 950.

103.   Therefore, Defendants' curfew orders violate Plaintiffs' First Amendment rights.

104.   Plaintiffs have suffered and will continue to suffer injury as a proximate result of these violations.

**COUNT TWO: Violation of the First Amendment to the United States Constitution: Establishment of Religion**
**(by Plaintiff Dolan against the San Bernardino Defendants)**

105.   Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1-89 as though set forth fully herein.

106.   The San Bernardino Order's curfew exemption for persons traveling to or from religious meetings does not have a secular purpose. *See Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007); *Lemon v. Kurtzman*, 403 U.S. 602, 613)

23

1    (1971).

2        107.   The primary effect of this exemption is to permit only religious

3    meetings to the exclusion of all other meetings. *Id.*

4        108.   This exemption has the appearance of endorsing religion. *Id.*

5        109.   By favoring religious assemblies over secular ones, this exemption is

6    a content-based restriction on Plaintiffs' freedom of assembly. *See Reed v. Town of*

7    *Gilbert, Ariz.*, 576 U.S. 155 (2015).

8        110.   The exemption is not necessary to a compelling government interest,

9    nor is it narrowly drawn to achieve that end. *Id.*

10       111.   Therefore, the San Bernardino Order violates Plaintiff Dolan's First

11   Amendment rights.

12       112.   Plaintiff Dolan has suffered and will continue to suffer injury as a

13   proximate result of the San Bernardino Defendants' violation of these rights.

14   **COUNT THREE: Violation of the Fifth, Ninth, and Fourteenth Amendments**
**to the United States Constitution: Freedom of Movement**
15   **(by Plaintiffs BLM-LA, Beltran Villalobos, Stith, and Ray against all Los**
**Angeles Defendants; and by Plaintiff Dolan against the San Bernardino**
16   **Defendants)**

17       113.   Plaintiffs repeat and incorporate by reference all allegations contained

18   in paragraphs 1-89 as though set forth fully herein.

19       114.   The Curfew Orders violate the Constitution's protection for the

20   freedom of movement. "Citizens have a fundamental right of free movement,

21   'historically part of the amenities of life as we have known them.'" *Nunez by*

22   *Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (citations omitted);

23   *United States v. Wheeler*, 254 U.S. 281, 293 (1920). State restrictions on this right

24   must both serve a compelling state interest and be narrowly tailored to accomplish

25   that objective. *Nunez*, 114 F.3d at 946.

26       115.   The Curfew Orders' restrictions on movement are not narrowly

27   tailored. They apply far more broadly than necessary to address any emergency

28   that remains in existence. They also apply to many entirely innocuous types of

24

movement, including outdoor recreation, travel for groceries and family caregiving obligations, and various others. The Constitution does not permit such a draconian deprivation of liberty under these circumstances. *Cf. Nunez*, 114 F.3d at 948 (striking down curfew order because "it does not provide exceptions for many legitimate activities."). Therefore, Defendants' curfew orders violate Plaintiffs' constitutional rights.

116.   Plaintiffs have suffered and will continue to suffer injury as a proximate result of these violations.

**COUNT FOUR: Violation of the Fifth and Fourteenth Amendments to the United States Constitution: Due Process Notice (by Plaintiffs BLM-LA, Beltran Villalobos, Stith, and Ray against all Los Angeles Defendants; and by Plaintiff Dolan against the San Bernardino Defendants)**

117.   Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1-89 as though set forth fully herein.

118.   The Curfew Orders are unconstitutional because they provide insufficient notice in several respects.

119.   The Fifth and Fourteenth Amendments prohibit deprivations of liberty without "due process," which includes notice sufficient "reasonably to convey the required information." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

120.   The Curfew Orders fail to provide sufficient notice because, given their breadth, officers seeking to enforce them must provide notice to the general population of their intent to do so prior to any citation or arrest. *Cf. In re Juan C.*, 28 Cal. App. 4th 1093, 1097 (Cal. Ct. App. 1994) (order permitted arrest only of "such persons as do not obey this curfew *after due notice, oral or written, has been given to said persons*") (emphasis added).

121.   In addition, the Orders have been ambiguous as to critical terms, including whether they include exemptions for media personnel, their temporal scope, and even whether they will go into effect at all.

122.   Therefore, Defendants' curfew orders violate Plaintiffs' Due Process rights.

123.   Plaintiffs have suffered and will continue to suffer injury as a proximate result of these violations.

## PRAYER FOR RELIEF

1.  Plaintiffs respectfully request that the Court grant the following relief:

a.   Issue an injunction ordering Defendants, their subordinates, agents, employees, and all others acting in concert with them to rescind the Curfew Orders described herein;

b.   Issue an injunction ordering Defendants, their subordinates, agents, employees, and all others acting in concert with them to cease all enforcement of the curfew orders, both directly and via arrests for unlawful assembly;

c.   Enter a judgment declaring the curfew orders unlawful under the First, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution;

d.   Award Plaintiffs reasonable attorneys' fees and costs; and

e.   Grant any other relief that this Court may deem proper and just.

Respectfully Submitted,

Dated June 3, 2020                    /s/ Ahilan T. Arulanantham
                                      AHILAN T. ARULANANTHAM
                                      Counsel for Plaintiffs